Filed 5/15/14  Palma v. Rite Aid CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARTHA PALMA, | B244766 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC465411) |
| v. | |
| RITE AID CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael Stern, Judge.  Reversed and remanded for new trial.

Manatt, Phelps & Phillips, Sandra R. King, Benjamin G. Shatz and Alison S. White for Defendant and Appellant.

Shegerian & Associates, Inc., Carney R. Shegerian and James Urbanic for Plaintiff and Respondent.

Appellant Rite Aid Corporation (appellant) appeals from a judgment entered in favor of its former employee respondent Martha Palma (respondent) following a jury trial of claims for wrongful termination and disability discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1] Appellant claims, among other things, that the trial court prejudicially erred in refusing to give a mixed-motive instruction to the jury that an employer is not liable if an employee would have been discharged for a non-discriminatory reason under standards articulated in *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*). We agree and reverse the judgment.

## FACTS AND PROCEDURAL BACKGROUND

**Employment, Termination and Complaint**

Respondent began working as a cashier for appellant in 1986, when she was twenty years old. She worked for appellant until March 2011 when she was terminated after appellant concluded an investigation of charges respondent had asked employees to work "off the clock" and violated employer timekeeping policies.

Respondent filed a complaint against appellant and respondent's former supervisor, Jilbert Shahdaryan, on July 14, 2011.[2] The complaint contained eight causes of action for: failure to accommodate and engage in the interactive process, retaliation, discrimination and harassment in violation of the FEHA (first); discrimination and harassment in violation of the California Family Rights Act (CFRA) (§ 12945.2) (second); age and gender discrimination in violation of the FEHA (third and fourth); wrongful discharge in violation of public policy (fifth); breach of contract (sixth); intentional infliction of emotional distress (seventh); and defamation (eighth). Respondent dismissed her claims for CFRA harassment, age discrimination and defamation prior to trial and the intentional infliction of emotional distress cause of action during trial. The trial court summarily adjudicated the contract claim against

---

[1]     Any unspecified statutory references are to the Government Code.

[2]     Shahdaryan was dismissed by stipulation during the trial.

2

respondent and granted appellant's motion in limine on the failure to accommodate claim for failure to exhaust administrative remedies. The trial court granted nonsuit on the gender discrimination cause of action.

Appellant answered the complaint raising a number of affirmative defenses including that the employment actions taken against respondent were for legitimate, non-discriminatory, non-harassing and non-retaliatory reasons (third). Appellant also asserted as affirmative defenses good faith belief (fourth) and waiver of claims by respondent's conduct (sixth). Appellant conceded at trial that it did not plead a mixed motive affirmative defense.

**Trial Evidence of Respondent's Work Performance and Disability**

After beginning her career with appellant in 1986 as a cashier, respondent was subsequently promoted to manager in September 2004. She managed stores in Alhambra, Rosemead, Arcadia and Temple City. In 2009, respondent's district manager, Bradley Lohman, promoted her to manager of the Highland Park store, which was larger and busier than the Temple City store respondent had been managing. The Temple City store had $2 million in sales and the Highland Park store had $4 million in sales.

When appellant began managing the Highland Park store in 2009, she had a budget of $7,000 a week to allocate between management and the employees. By late 2010, the weekly budget was reduced to $5,600. According to Lohman, the district manager did not determine how many employee hours a particular store manager had. Rather, it was determined at the corporate level.

Lohman, who was no longer employed by appellant at the time of trial, described respondent as hardworking, very professional and caring about the job. Lohman counseled the store managers about not allowing or asking employees to work off the clock. Employees were not expected to work off the clock on their own time. Lohman instructed the managers to pay employees for overtime.

Lohman made regular and unannounced visits to stores so he could see what the store looked liked to customers. Lohman walked through the stores with the managers to check up on specific areas based on a store visit guide provided by the company.

Appellant had a feedback system based on a color scheme of red, yellow and green: red meant the store was not up to expectations; yellow meant the store was passing but needed corrections; and green meant the store was in very good condition. Lohman thought respondent did a fairly good job managing the Temple City store but that she failed at some of the skills. In a March 2009 review, Lohman noted, among other things, that appellant had issues with back room organization. However, Lohman would not have promoted her to the Highland Park store unless she was doing a very good job.

Lohman testified that several issues arose when respondent moved to the Highland Park store. The issues included: stockroom controls, below standard cleanliness, out-of-stock items, substandard merchandising, and rundown and improperly maintained seasonal aisles. In August 2009, Lohman completed a store compliance audit sheet evaluating the Highland Park store, in which he gave red failure ratings in a number of areas. In October and November 2009, Lohman gave the store overall ratings of red failure. However, in December 2009, he gave the store an overall yellow rating because there was some improvement in the store.

In January 2010, Lohman gave respondent a written counseling after the store failed a "back to normal" inspection, which is a transition from Christmas into January. The store should have been back in order, in stock and neat. All managers were aware ahead of time that the store was going to have the back to normal inspection and were provided with a checklist of what the district managing was going to inspect. Lohman's written counseling stated, "[Respondent] demonstrates poor accountability by blaming poor store conditions or results on her assistant manager and/or lack of resources rather than proactively managing the performance of or developing her assistant manager or accepting responsibility for the quality of her own work." Lohman did not feel that respondent's blaming poor store conditions or results or the assistant manager and the lack of payroll was sufficient justification for failing the inspection because the store had passed inspections under a previous manager's direction.

After giving respondent the written counseling, Lohman visited the store on January 13, 2010 and gave it a red failure. Lohman rated the store as a red failure on an

4

inspection in February 2010.  In March 2010, the store got an overall yellow rating because there was some improvement.  In April 2010, the store got a red rating because it fell backwards again.  Lohman visited the store on May 11, and May 21, 2010.  On May 21, 2010, the store received a yellow rating.  By June 2, 2010, Lohman gave the store a red rating because it appeared as though a lot of problems that had been corrected had resurfaced and became an issue.  When Lohman visited the store the next day, the overall rating was yellow because some improvements had been made.  However, in visits on June 9, and 12, 2010, Lohman gave the store red ratings.  Because he was getting concerned, Lohman visited the store again on June 15, 2010; that visit resulted in a yellow rating.  However, in a visit the next day on June 16, 2010, he gave the store a red rating.  The store got red ratings on June 29, 2010 and July 1, 2010.

When Lohman visited the store on July 14, 2014, it had an overall rating of green.  However, when he went back to the store the next day, the store got a yellow rating because the store started to deteriorate in a short period of time.  The same pattern occurred in visits on July 20 and July 21, 2010, where the overall rating was a green on the former day and a yellow on the latter day.  The store received a yellow rating on July 30, 2010.

In August 2010, Lohman was promoted.  Shahdaryan became respondent's district manager in September 2010.  Amy Oliveras, a clerk who worked in the Highland Park store, testified that Shahdaryan told her, "Good luck with the woman manager."  When she asked what he meant, he smirked.

Around August 2008, respondent began having pains in her shoulder, hands and feet.  At times, she had stiffness and swelling in her hands. She would get bumps on her hands and because of the swelling she could not grasp and hold objects.  At the beginning of 2009, she would have flare-ups.  However, as time progressed, her mobility was becoming more difficult and she was in pain more often.  By the middle of 2009, she had swelling in her feet, knees, and shoulder.  She wore braces on her hands and had difficulty walking and lifting objects.  She wore ace bandages on her ankles for support because it was painful to walk.

5

During Shahdaryan's first store visit as district manager, Shahdaryan was very critical of the stockroom and the way it looked. When respondent told him she was sick and in pain, he just shook his head. After he walked the store, he asked respondent to accompany him to his car where he gave respondent his business card. He told her, "Martha, I should have taken a different direction with you. Do you know what I mean?" Respondent thought he meant, he should have written her up about the store. Respondent was upset because she had been on vacation and before she left the store was "almost perfect." While she was on vacation Jason Casal, the assistant manager, and another person from a different store were managing the store.

During the first month after that conversation with Shahdaryan's visit, he made comments about her not being able to walk fast. Once when they were walking the store, respondent was walking really slowly, hunched over and wobbling because her feet were in a lot of pain. He picked up a cane and said to respondent, "Here, do you need one of these?" On a different occasion when they were walking the store, respondent fell behind because she was in a lot of pain. Shahdaryan stopped and with his arms crossed said, "What's wrong?" He asked her, "Aren't you embarrassed not to walk straight?" He then stated, "I would be."

Shahdaryan made frequent visits to the store. At least half the time, he would tell respondent to "hurry up" or that she was too slow. During one visit, when they were in the stockroom, he began pointing out things that needed to be done. Respondent explained that she was doing the best she could with the employees she had. She also mentioned that she could not do any heavy lifting because she was in a lot of pain. In response, he shook his head and said, "Well, if you're in so much pain, why don't you just leave or quit?"

By the end of September 2010, respondent's pain was intolerable. She was crying every day. She needed help getting out of her car. She used a cane to walk. When she would come to work, sometimes she could not open the safe because her hands were so stiff. She could not bend her left knee because it was really swollen. She had to wear a knee brace. Sometimes she wore a back brace and braces on both hands.

6

On September 29, 2010, respondent went to see a doctor and was placed on a medical leave of absence. When respondent called Shahdaryan to inform him of the absence, he seemed upset and asked, "Martha, did you plan this?" Her medical leave was extended through October 2010.

Respondent returned to work in early November 2010 after being off for five weeks. Within days of her return, Shahdaryan gave respondent a written warning. According to respondent, when Shahdaryan inspected the store on November 11, 2010, he held her accountable for things that occurred while she was out on medical leave.

Also on November 11, 2010, respondent contacted human resources manager, Carlos Viramontes. Viramontes walked into the store and found respondent in her office crying. She explained that she was in a lot of pain and was having a hard time moving. He asked if Shahdaryan knew that she was sick. When she said she told Shahdaryan that she was in a lot of pain, Viramontes said he could not believe it. Viramontes told her she needed to go to the doctor. She continued to work until another manager came to work and then she went to the doctor who placed her on a second medical leave.

In November 2010 during her second medical leave, respondent was diagnosed with rheumatoid arthritis and prescribed medicine which significantly reduced her symptoms and pain. When respondent returned to work later in November 2010, she did not ask for any changes in her schedule, job duties and any aspect of her job. Respondent was able to work through the day without the type of pain she had experienced earlier in the year. Although she was feeling much better, she still had flare-ups.

When respondent returned to work in late November 2010, Shahdaryan was not friendly with her and appeared to be "mad" at her. Respondent had flare-ups in her physical condition, which she believed were caused by Shahdaryan's visits. He would make her feel stressed and derailed because nothing she did was good enough for him. He made comments like she was "too slow". In December 2010, respondent told Viramontes that she felt "humiliated" and "harassed" by Shahdaryan. However, respondent testified that she did not tell Viramontes or anyone else about Shahdaryan's comments concerning her disability.

7

In January 2011, Shahdaryan was very critical of her saying she did not know how to write a schedule and that her "disease" made her incompetent.

On February 11, 2011, respondent e-mailed Shahdaryan that her budget was not sufficient to run the store and that no employees could work off the clock as Brandon Spencer had done for Shahdaryan. At the trial, Spencer, who no longer worked for appellant, testified that he worked as an assistant manager for respondent at the Highland Park store. Prior to working for respondent, Spencer worked as an assistant manager for Shahdaryan, who managed the Highland Park store before being promoted to district manager. Spencer worked off the clock for both respondent and Shahdaryan. When Spencer worked off the clock, he did not tell anyone because he knew he could be terminated for doing it. When he worked off the clock for respondent, she tried to make it up to him by clocking him in early on another day and allowing him to come in a couple of hours later. Spencer testified that respondent did this about four or five times for him.

On February 14, 2011, Shahdaryan gave respondent a final written warning. On February 14, 2011, respondent sent Viramontes an e-mail in which she complained that Shahdaryan had given her a write-up that was "unfair" because her store was understaffed. Respondent's e-mail did not mention her disability. Respondent also complained to Shahdaryan's assistant, Maria Gomez, that she felt Shahdaryan was harassing her, was critical of her and wanted to fire her.

**Respondent's Termination after a Timekeeping Violation Investigation**

In early 2011, loss prevention manager, Chris Wade, was in respondent's store investigating employees about suspected employee theft. Respondent's assistant manager Casal told Wade that respondent had asked Casal to work on his day off without clocking in or out on the day he worked. After Wade reported the incident to Shahdaryan, the two met with Casal, who repeated the allegations. Casal provided a written statement that respondent told him that his job was on the line if he did not come to work on January 13, 2011. She told him to come to work and she would adjust his time records in the future to credit him for four hours that he worked off the clock on

8

January 13, 2011. Casal wrote that respondent then adjusted his time by two hours on two subsequent shifts to compensate him for the unpaid hours he worked on January 13, 2011. At trial, Casal testified that respondent was honest and that she had not asked him to falsify time records. She asked him to work so the store could meet the standards during the inspection.

Wade gave Casal's written statement to Viramontes's successor, Jaklen Alkyan, who testified that she was unaware of respondent's disability or her medical leaves of absence. Wade and Alkyan interviewed cashier Xochitl Alvarado, who provided a written statement that respondent had once picked her up at home on her day off and took her to work. Respondent told her not to say anything about working on her day off. Respondent denied any wrongdoing when Wade and Alkyan confronted her with the allegations. Alkyan decided to suspend respondent pending further investigation. Respondent testified that at the end of the interview Alkyan told her that Shahdaryan would decide what would happen to respondent. Wade and Alkyan denied that this happened.

Wade and Alkyan subsequently interviewed additional employees. Roberto Lopez provided a written statement that respondent asked him once to work off the clock for two hours. The following week respondent added two hours that he did not work. Renee Hernandez provided a written statement that she was owed two hours of pay because she returned to work when a store alarm went off. When Hernandez asked to be paid, respondent refused to pay her. Hernandez testified that respondent promised to pay her by adjusting Hernandez's time the following week so she could get paid for hours she did not work. Hernandez had not been paid for reporting for alarm duties under other supervisors but had not asked to be paid because she did not know that she was entitled to be paid.

Wade testified that clerk Olivares also told him and Alkyan that she worked off the clock at respondent's request. However, at trial Oliveras testified that she never worked off the clock and denied telling Wade and Alkyan that she did.

9

Respondent denied asking anyone to work without being paid. At trial, respondent called a number of employees to testify that she never asked them to work without pay and that they were paid for the hours they worked.

Appellant tracked employee time through the Kronos system. Employees clock in at the register when they come in, clock out to go to lunch, clock back in after lunch and clock out to go home. At trial, respondent testified that employees would forget to clock in and out all the time. Respondent corrected their mistakes but never deleted hours.

Alkyan reviewed the computerized time entries for the store. In Alkyan's opinion, there were too many adjustments to time punches by respondent. Respondent also failed to include notes as required by company policy which would have explained the changes to the time records. When asked about the changes to the time punches, respondent denied any wrongdoing. Respondent wrote a statement confirming that she understood appellant's time record policies.

Alkyan then discussed the investigation results with her supervisor, Senior Human Resources Manager, Roger Ceballos. According to Ceballos, he did not know of respondent's disability or of her medical leaves. Alkyan and Ceballos testified that they jointly decided to terminate respondent based on the time card manipulations. Aklyan, Ceballos and Shahdaryan testified that Shahdaryan was not involved in the decision to terminate respondent. Rather, appellant's practice is that human resource makes the decision to terminate employees. However, once Ceballos and Alkyan made the decision, Ceballos e-mailed Shahdaryan directing him to tell respondent she was terminated. Respondent testified that Shahdaryan telephoned her and said, "I'm firing you for breaking company policy and company protocol, and you're too sick to work anyway."

Respondent's expert testified that respondent suffered from major depressive disorder associated with the events of her employment. Respondent's forensic economist testified that respondent's economic losses ranged from $522,990 to $1.5 million.

10

**Jury Instructions and Argument**

The trial court instructed the jury with former CACI Nos. 2430, 2505, 2540, 2620 and 2507 explaining "a motivating factor/reason" was the standard for determining the employer's liability. The jury was given a special verdict form based on the instructions.

Appellant requested a "mixed-motive" instruction in BAJI No. 12.26 which provided: "If you find that the employer's action, which is the subject of the plaintiff's claim, was actually motivated by both discriminatory and non-discriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision." When the trial court asked if the mixed-motive defense had been raised in appellant's answer, appellant conceded that it was not raised as an affirmative defense. After reviewing appellant's answer, the trial court refused the instruction on the ground it was "not going to try" the mixed-motive defense "at this late stage." The trial court also refused appellant's proposed instructions on a good faith belief and business judgment.

Respondent's counsel argued to the jury that "all [respondent] has to prove [is] that a motivating reason among a hundred motivating reasons for her termination or for her harassment was her medical leave or her disability . . . or her protesting discrimination and/or harassment." "[If] any of them was a motivating reason among whatever number of reasons for her termination, then the law was violated. In other words, she wins."

**The Special Verdict**

The jury returned a special verdict in favor of respondent on the discrimination and harassment claims. The jury found by a 10 to 2 vote that respondent had a disability which was a motivating reason for appellant's decision to discharge her and that appellant's conduct was a substantial factor in causing her harm. The jury also found that respondent was subjected to unwanted harassing conduct because of her disability.

The jury awarded respondent a total of $3,522,070 consisting of: $81,319 for past economic loss, $440,751 for future economic loss; $1.5 million for past noneconomic loss; and $1.5 million for future noneconomic loss. After the trial court denied

11

appellant's new trial and judgment notwithstanding the verdict motions, appellant filed this timely appeal.

## DISCUSSION

### I. Review Standards

Appellant claims it was prejudiced when the trial court erroneously refused to give its proposed BAJI instruction on "mixed motive." "A party is entitled upon request to correct, nonargumentative instructions on every theory of the cased advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) However, "'Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]' [Citation.] Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. [Citations.]' [Citations.]" (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

We review the propriety of the jury instructions de novo. (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).) The record is reviewed in a light most favorable to the requesting party to determine whether the instruction was warranted by substantial evidence. (*Alamo, supra,* 219 Cal.App.4th at pp. 475-476.) However, even if there was instructional error, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule, supra,* 8 Cal.4th at p. 580.)

12

## II. The *Harris* Opinion

Section 12940, subdivision (a) prohibits employers from taking adverse employment actions against an employee on the basis of a disability. In February 2013, while this appeal was pending, our Supreme Court held that an FEHA plaintiff seeking damages for discrimination is required to show that an illegitimate criterion was a "substantial motivating factor" for the employment decision. (*Harris, supra*, 56 Cal.4th at p. 232.) *Harris* concluded that CACI No. 2500 incorrectly allowed the jury "to determine whether discrimination was a motivating factor/reason for Harris's termination." Instead, the jury was required to determine whether the discrimination was a substantial motivating factor. (*Id*. at p. 232.) "Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision. At the same time, for reasons explained above, proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Ibid*.) Moreover, once the employer establishes the same decision defense, a court may not award economic and noneconomic damages, back pay or order reinstatement under the FEHA; but, the employee may obtain declaratory and injunctive relief, fees and costs. (*Id*. at pp. 232-238.)

After *Harris* was decided, *Alamo v. Practice Management Information Corp.*, *supra*, 219 Cal.App.4th 466, determined that the trial court prejudicially erred in instructing the jury with former versions of CACI Nos. 2430, 2500, 2505 and 2507 under *Harris*. *Alamo* concluded that the proper standard for a FEHA discrimination claim is not a motivating reason as used in the former CACI instructions but is a substantial motivating reason as articulated in *Harris*. (*Alamo*, *supra*, 219 Cal.App.4th at pp. 469-470.)

Under these standards, the trial court erred in refusing appellant's proposed mixed-motive instruction and instructing the jury with former CACI instructions that "a

13

motivating reason" is sufficient to establish liability. Viewing the evidence in a light most favorable to appellant, it is reasonably probable that the instructional error prejudicially affected the ten to two verdict. (*Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1342-1343.) Thus, the error was prejudicial.

Moreover, we disagree with respondent that the trial court properly refused the instruction because appellant did not plead a mixed-motive defense in its answer. *Harris* concluded the employer's failure to plead a same-decision defense as an affirmative defense did not bar a mixed-motive instruction. (*Harris, supra*, 56 Cal.4th at p. 240.) *Harris* explained: "Because the burden is on a defendant to make a same-decision showing, it should plead this defense. In other words, if an employer wishes to assert the defense, it should plead that if it is found that its actions were motivated by both discriminatory and nondiscriminatory reasons, the nondiscriminatory reasons alone would have induced it to make the same decision. [¶] However, '[n]o error or defect in a pleading is to be regarded unless it affects substantial rights.' [Citations.] The primary function of a pleading is to give the other party notice so that it may prepare its case [citation], and a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights. This principle is consistent with the rule that leave to amend a pleading should be liberally granted as long as there is no timeliness problem under a statute of limitations or prejudice to the opposing party. [Citations.]" (*Ibid.*)

In this case, appellant's answer asserted that the adverse employment action was for legitimate, non-discriminatory, non-harassing and non-retaliatory reasons (third). Appellant also asserted as affirmative defenses good faith belief (fourth) and respondent's own conduct waived the claims as asserted in the complaint (sixth). Appellant's theory at trial was consistent with the defenses that respondent's conduct in violating appellant's timekeeping policies was what prompted her termination. And, respondent's substantial rights would not have been affected by an instruction that the jury could partly believe respondent's evidence of discrimination and at the same time believe that the discharge was for a nondiscriminatory reason. (*Harris, supra*, 56 Cal.4th

14

at p. 240.)  Thus, the failure to plead mixed-motive as an affirmative defense did not bar the instruction under the circumstances of this case.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.  Appellant is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.*
FERNS

We concur:


_____, P. J.
BOREN


_____, J.
CHAVEZ

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.