Filed 2/18/25 (unmodified 1/15/25 opn. and 2/6/25 publication order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| I.C.,<br><br>   Plaintiff and Appellant,<br><br>      v.<br><br>COMPTON UNIFIED SCHOOL DISTRICT et al.,<br><br>   Defendants and Respondents. | B322148<br><br>Los Angeles County<br>Super. Ct. No. BC665118<br><br>**ORDER MODIFYING OPINION**<br><br>**[No Change in Judgment]** |

THE COURT:

    The opinion in the above-entitled matter filed on January 15, 2025, and certified for publication on February 6, 2025, is modified as follows.

1. At page 21, first full paragraph, third and fourth sentences, replace "opening argument" with: opening statement.

2. At page 21, second paragraph, replace the first sentence "The defense opening argument . . ." with:

    The defense opening statement included a slow motion review of the video and the assertion that

Mr. Godinez was doing the right thing for the right reasons, while plaintiff and Christopher were not acting like reasonably careful teenagers of the same age, intelligence, experience and knowledge.

There is no change in the judgment.

_____
STRATTON, P. J.        GRIMES, J.        VIRAMONTES, J.

Filed 1/15/25; Certified for Publication 2/6/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| I.C., | B322148 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. BC665118 |
| COMPTON UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County.  Thomas D. Long, Judge.  Affirmed.

Law Offices of Hirji & Chau, Rosa K. Hirji and Alexander F. Rodriguez for Plaintiff and Appellant.

Olivarez Madruga Law Organization, Terence J. Gallagher and Leslie Anne Burnet for Defendants and Respondents.

_____

## SUMMARY

In September 2016, plaintiff was a student, almost 16 years old, when he and a friend started a fistfight during their art class. The teacher, who weighed 375 pounds and had recently been using a walker because of a back condition, immediately intervened to prevent the two boys from hurting themselves or someone else. While pulling the larger boy away from plaintiff – and being hit himself by plaintiff, who continued to throw punches after the other boy stopped—the teacher lost his balance and fell onto plaintiff, breaking plaintiff's leg. One of the other students recorded the teacher's intervention in the fight.

Plaintiff sued the teacher and the school district for negligence. Plaintiff contended the teacher should not have tried to stop the fight because of his weight and physical condition, and he should have done something else, sooner, to prevent the fight. Plaintiff also contended the school district had failed to train its teachers how to safely intervene in physical altercations between students. After 15 days of trial, the jury, who viewed the video of the incident many times during the trial, concluded that neither the teacher nor the school district was negligent, and that plaintiff and the other boy were each 50 percent responsible for the harm to plaintiff.

Plaintiff appeals, contending the trial court should have granted his motion for judgment notwithstanding the verdict (JNOV); erred in refusing multiple special instructions plaintiff requested; and erred in excluding an expert witness. We find no error and affirm the judgment.

## FACTS

We have reviewed the record and recount the relevant facts, as we must, in the light most favorable to the verdict. We

will supplement our recitation as necessary in connection with plaintiff's contentions on appeal.

## 1. Plaintiff's Injury

The incident resulting in this lawsuit occurred on September 19, 2016, during defendant Marco Godinez's art class at Dominguez High School in the Compton Unified School District (the District). Mr. Godinez had been an art teacher at Dominguez High for about 15 years. Class had begun, with the students seated and working on their assigned projects.

Plaintiff I.C., who was almost 16 years old, and his friend Christopher L. began "horseplaying." The horseplay was "slap-boxing," which in this case consisted of playfully trying to tap each other on the cheek and avoid getting tapped at the same time. Mr. Godinez, who was at his desk in the center of the class grading assignments in sketch books, saw them and told them to stop, and they stopped.

They did not, however, stop for long. According to another student, A.F., the punching started approximately 30 seconds later. Mr. Godinez heard chairs screeching and looked up to see the two boys were on their feet and striking each other with full force. He yelled at them to stop as he made his way toward them, and saw a spray of blood somewhere between them. He intended to come in from behind Christopher, who was bigger, and pull him away. (The video of the incident begins at this point in the altercation.)

As Mr. Godinez grabbed Christopher around his shoulder, plaintiff hit Christopher, who collapsed downward, "and I [Mr. Godinez] ended up going down trying to protect [Christopher] from hitting the table." As Mr. Godinez was "wrapping [Christopher] up," "holding [him] underneath me," Mr. Godinez started to fall forward. Plaintiff continued trying to

3

hit Christopher but instead struck Mr. Godinez three times, in the face, collarbone area and shoulder. Then Christopher escaped Mr. Godinez's grasp, and when that happened, Mr. Godinez "ended up falling the rest of the way. And instinctually I just tried to stop myself from falling by reaching forward, and what was there was [plaintiff]."

Mr. Godinez "ended up grabbing around or grabbing [plaintiff] by the legs to keep me from falling forward." He landed on plaintiff, who began screaming that his leg was broken. As they were on the floor, Mr. Godinez began to pull plaintiff toward him and put his hand behind plaintiff because he wanted to protect him until he could turn around to look for Christopher. At this point, he was not putting any weight on plaintiff. When he saw the fight was over, he directed his attention to plaintiff; told him "to stop rolling, stop moving"; stood up with help from students who rushed over to him; and told a student to call 911. Plaintiff's leg was broken and bleeding, with the bone protruding from his skin.

At trial, Mr. Godinez explained what happened in detail, with the jury viewing the 13- or 14-second video, which he testified was an accurate depiction of what he recalled happening that day.

Christopher also testified about what was happening on the video, frame by frame. He described Mr. Godinez's actions, after plaintiff and Mr. Godinez went down on the floor at about four seconds into the video, as "holding [plaintiff] down" for the remaining 10 seconds.

A.F., who was at the same worktable as plaintiff and Christopher, testified, based on his observation of the fight, to his belief "that if [plaintiff] would've stopped punching [after Christopher stopped punching], this wouldn't have escalated the

4

way that it did." He testified that when Mr. Godinez fell on plaintiff, it appeared to him (A.F.) "that he fell on him on accident," and that "Mr. Godinez did not intentionally tackle or try to bring down or actually drop [plaintiff]."

## 2. Mr. Godinez's Physical Condition

Plaintiff tried to establish that Mr. Godinez was negligent when he chose to intervene in the fight, falling because he was in no physical condition to intervene and was not trained to do so. Plaintiff presented evidence from Mr. Godinez's medical records and testimony from doctors that Mr. Godinez was obese (375 pounds and six feet two inches tall); suffered from sciatica; called or went to doctors for back pain on several days in September 2016, with a last visit to the emergency room for back pain on Friday, September 16, 2016, three days before the accident; and had been using a walker to get around.

His emergency room doctor on September 16, 2016, Amy Koplovsky, testified from the medical record of that day that he "can stand and walk a few steps but then has a shooting pain down his legs which cause his legs to buckle and needs the walker." She gave him a shot of Toradol and testified she hoped it would alleviate his pain that night, but it was highly unlikely to do so in the future. She also testified that, "hopefully," the Toradol, "in combination with the prednisone, if he's doing stretches, exercising, the recommended treatment, that all those things combined would be factors that would hopefully alleviate the inflammation and pain."

Mr. Godinez testified that he woke up the following morning (Saturday) "feeling much, much better," and did stretches for sciatica throughout the weekend. He continued to feel much better on Monday morning, the day of the fight, and had no back pain until that evening, after the incident, when his

5

back was "a little tight." He visited the emergency room in the afternoon or evening after the fight, on the advice of the assistant principal and emergency personnel at the scene, to have his wounds from the fight checked out and documented. He did not complain of back pain, but he was using a crutch as a cane to avoid having his back tire out.

Mr. Godinez explained that he thought he felt so much better on the day of the fight because of the "combination of everything that was finally kicking in"—the shot, the prednisone he had been taking for two weeks, several visits to a chiropractor, and the stretching exercises. He also testified that none of his doctors put any kind of restriction on his activity at work, and never referred to him as having a disability or a handicap. He testified that his back did not have any impact on how he handled breaking up the fight, and his back did not feel tired or weak before the fight.

### 3.     The Training Issue

Plaintiff sought to prove that the District was negligent in its training of its teachers and staff.

Plaintiff presented evidence of several points admitted by defendants: that the District "employed a practice to train its teachers in non-violent crisis intervention for the safety of its students"; that the "purpose of non-violent crisis intervention training is to teach verbal and physical techniques to ensure the care, welfare, safety, and security of all students, even in violent moments"; and that the District's training program "states that non-violent physical crisis intervention should be used as a last resort and to minimize the risks. The staff should work with the team member whenever applying physical interventions."

The District's policy on employee security required the superintendent or designee to "ensure that employees are trained

in crisis prevention and intervention techniques in order to protect themselves and students. Staff development may include training in classroom management, effective communication techniques, and crisis resolution."

Plaintiff presented three exhibits referred to as the District's "CPI Manual." These are workbooks concerning "Non-violent Crisis Intervention," and "Non-violent Crisis Intervention, Integrating Positive Behavioral Interventions and Support (PBIS)." PBIS "was implemented into the [CPI] program," and the two programs "essentially are based on the same principles."

Jose Gomez, a CPI trainer, testified that the CPI training "is a tool for classroom management," with the "primary focus of it, to create a positive environment throughout the classroom." He said that PBIS training was the "more modern version" of CPI training. Training included topics such as nonverbal communication, paraverbal communication (tone, volume, cadence), and de-escalation techniques. Mr. Gomez testified that he did not train the Dominguez High School staff on "the use of restraints" or "on ways of taking students to the ground in a confrontation." Material on understanding the risks of restraints was provided to participants in the training, but was not covered by the trainer.

Another CPI trainer, Felicia Fernandez, similarly stated that she taught units 1 through 7 and unit 10 of the material, and did not cover units 8 and 9 (which included "physical control and restraint positions to be implemented when physical control is necessary as a last resort due to an individual's dangerous behavior" and "situational role-plays"). Ms. Fernandez testified that those materials were given to the teachers being trained, "[s]o they had it available to them, but it was not an area that needed training at that time."

Mr. Godinez received training in 2014 and in 2016. He testified that he did not receive training "on safe intervention with student fights," "other than the CPI training." Mr. Godinez testified that "[w]e had to go through the entire manual. We had to read it," but "they did not do a demonstration" of how to safely physically intervene when two students are in an altercation. Mr. Godinez was asked whether the District had "a policy in regard to what teachers are required to do to break up a fight." He responded: "The District just requires that we take some sort of action, but it gives us the leeway to determine what that action is. It sees us as professionals and just recognizes we are supposed to act in the best interest of safety for our students."

Blain Watson, a witness in plaintiff's case-in-chief, was principal at Dominguez High School from July 2017 (after the incident) through June 2020. Plaintiff had previously deposed Mr. Watson because he was deemed the person most knowledgeable on "the policies and procedures of Dominguez High School's safety plan for student altercations." Plaintiff's counsel asked him about the PBIS program. Mr. Watson described it as "a framework of how you want to model positive behaviors for students and between students and make that be the expectation." He stated that "there is always going to be fights, right? And so it's a framework." He explained that "[i]t's a national model," and "has been a huge framework for schools to follow . . . for a couple decades now," and is used throughout the United States.

Mr. Watson also testified that "[a]s far as I've seen in my years working as a professional for different districts, I've never seen a policy that articulates specifically a recipe or instructions on how to handle a physical altercation between students." In 22 years in the profession, "I've never seen a policy that dictates

8

how people should interact when there's a physical altercation. There's no policy for that." He testified it would be "irresponsible" to have "a written recipe or formula for how teachers should or should not step in to break up a fight." He explained that "[b]ecause every altercation between students is situational, and you don't know necessarily what could happen if you follow a script that is provided by you for you by someone who is not present in that situation to deal with it." He testified it is "[a]bsolutely" typical for educators in general "that they are using their professional discretion." He testified that it is "up to that individual teacher" to exercise "their best judgment" about intervening in physical fights.

Plaintiff sought to offer testimony from Douglas Dickerson "as an expert in the field of tactics of addressing juvenile delinquency and professional training development." Mr. Dickerson had an extensive background in law enforcement and juvenile delinquency. The trial court questioned the relevance of his opinions: "Because what I see is I see someone— if we were dealing with how a policeman or safety officer had dealt with the plaintiff, I would see the relevance of his testimony. [¶] But given what we are dealing with and given that he notably told us he's not worked with kindergarteners through 12th graders, how are his opinions going to be relevant?" The court observed that "anybody can watch the video," and asked what Mr. Dickerson's opinions were going to be.

Plaintiff's counsel replied: "His opinions are going to be from his standing point whether or not the . . . intervention was just and how the intervention happened, whether or not it was conducted safely, whether or not they followed the training, whether or not the training was appropriate, whether or not the training was good enough from the District to its employees."

9

The court asked, "Well, what experience does he have with training teachers as opposed to police officers to handle kindergarteners to 12th graders?" Counsel said that he "has trained many school districts" and his juvenile delinquency background "can be all the way from ages 12 through 18." The court responded that "I think we may well be listening to some voir dire of [Mr. Dickerson] by [defense counsel] tomorrow morning."

After voir dire of Mr. Dickerson the following day, the court observed that "I'm not persuaded yet that I've heard anything that shows what his expertise is with respect to managing a classroom and dealing with an unruly student in a classroom."

The court again asked plaintiff's counsel what opinions Mr. Dickerson would offer if he were qualified. Counsel replied that Mr. Dickerson would "talk about the risks and the proper techniques to stop juveniles fighting one another when controlled by staff or other options that the individual, in this case, the defendant, could have taken to safely review the situation. [¶] He's also going to talk about what the District can do towards training people so to better educate its staff to make sure it's a safer campus for all students, including the combative juveniles."

The court held that Mr. Dickerson was "not qualified in the area of expertise that's relevant, and . . . to the extent there is any relevance to it, it outweighs 352. [¶] So I'm ruling that he is not qualified as an expert."

During the defense case, counsel sought to offer expert testimony from Craig Cunningham, who was president of "21st Century Education Enterprises," a company that provided "inservice training for teachers" and litigation services, among other things. He had an extensive, 55-year background in education, and the defense offered him "as an expert in the field

10

of educational practices including supervision of instruction, safety of instruction, and school safety practices."

In a discussion of why an expert was needed, the court observed that, "There's evidence of what training the teachers got. Right now there's no evidence that it was inadequate," and "You are rebutting something that's not there, and that's a waste of time." Addressing plaintiff's counsel, the court said: "I'm not aware that you have any evidence that the training received was below what is offered in most school districts because you don't have any evidence on that subject." Plaintiff's counsel agreed that "[t]his is not the case that is brought on some nuanced school code or some other code. It's a general negligence case. [¶] They [the jury] can make their own decision." The court concluded that "the marginal relevance is outweighed by the undue consumption of time," and excused the defense witness.

**4. Other Evidence, the Instructions and the Verdict**

The parties presented a great deal of evidence, much of it disputed, on the extent of plaintiff's injuries, the surgeries required, the success of the surgical repairs, the impact of plaintiff's injuries on his functioning, the existence or not of any disability from the leg injury, the cause and gravity of his posttraumatic stress syndrome, limitations on his earning capacity, and so on. No appellate issues require us to address that evidence.

The trial court instructed the jury with CACI instructions on negligence, as modified by plaintiff. The court refused several special instructions proposed by plaintiff on the duties of school authorities and standards of care, finding none of them was necessary to assist the jury in deciding the questions in the special verdict form. (We describe the instructions in our discussion of plaintiff's claim of error, *post*.)

11

Question No. 1 of the special verdict asked the jury, "Was Marco Godinez negligent?" and "Was Compton Unified School District negligent?" The jury answered "No" to both questions. The form directed the jury: "If you answered yes for any defendant in question 1, then answer question 2 for that defendant. If you answered no for any defendant in question 1, insert the number zero next to that defendant's name in question 8. If you answered no for all defendants in question 1, stop here, answer no further questions, and have the presiding juror sign and date this form."

The jury did not answer questions Nos. 2 through 7, but nevertheless answered question No. 8, which asked: "What percentage of responsibility for [plaintiff's] harm do you assign to the following? Insert a percentage for only those who received 'yes' answers in questions 2, 5, or 7." The jury entered zeros for Mr. Godinez and the District, and entered 50 percent for plaintiff and 50 percent for Christopher.

The jury was polled, and the clerk reported that "nine jurors answered yes, and three jurors answered no." Judgment was entered on May 11, 2022.

On May 27, 2022, plaintiff filed a motion for JNOV or in the alternative for a new trial on multiple grounds, including that the evidence entitled plaintiff to judgment, and that the refusal to give plaintiff's special jury instructions and the exclusion of Mr. Dickerson's testimony required a new trial.

On July 5, 2022, the trial court denied plaintiff's motion. Plaintiff filed a timely notice of appeal.

## DISCUSSION

### 1. The JNOV Ruling

"A motion for [JNOV] may be granted only if it appears from the evidence, viewed in the light most favorable to the party

12

securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) The standard of review on appeal is the same: "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Ibid.*)

The facts recited above are substantial evidence supporting the verdict that neither Mr. Godinez nor the District was negligent, so we necessarily affirm the trial court's ruling. Plaintiff makes two arguments, both of which require us to weigh the evidence, which we cannot do.

Plaintiff first contends the District "abdicated its duty to train and there was insufficient evidence to support [the District's] position that its lack of training was reasonable." This is a convoluted suggestion that the District had a burden to establish that "its lack of training was reasonable." Of course, the District had no such burden. It was plaintiff's burden to show the District failed to do something "that a reasonably careful person would do in the same situation."

Plaintiff's contention rests entirely on the proposition that the District "did not train . . . Godinez on safe physical interventions" in student fights, leaving it to the teacher's discretion, and the District's training "did not train on those portions related to restraints or physical intervention." This ignores the testimony from Blain Watson—plaintiff's own witness—that the PBIS training was used throughout the United States and, more particularly, that it is "[a]bsolutely" typical for educators in general "that they are using their professional discretion," and it is "up to that individual teacher" to exercise "their best judgment" about intervening in physical fights between students.

Moreover, plaintiff neither presented, nor proffered any evidence, that the District's training was different from that provided anywhere else, or that it was necessary to provide school teachers with demonstrative training on "restraints or physical intervention." As already mentioned, the trial court observed during the defense case that there was evidence "of what training the teachers got," and "[r]ight now there's no evidence that it was inadequate," and "I'm not aware that you have any evidence that the training received was below what is offered in most school districts because you don't have any evidence on that subject." The jury heard and saw all the evidence plaintiff presented on training (see pp. 6-9, *ante*)—the District's admissions, the manuals, the board policy, testimony from two CPI trainers and from Mr. Watson—and rejected plaintiff's claim that the District acted unreasonably in the training it gave or in the discretion it gave its staff in handling student alterations. The trial court agreed, and so do we.

Plaintiff's second contention is that there was "insufficient evidence to support [the District's] claim that Godinez acted with due care in intervening in the student fight." Again, it is plaintiff who must prove that Mr. Godinez did not act with due care. The jury apparently believed Mr. Godinez's testimony and found he acted with due care. One of many examples is his testimony, in response to questions from plaintiff's counsel about whether he made "a split second decision to intervene immediately," that yes, it was a split second choice. Counsel asked him, "You did not consider alternatives during that split second, did you?" and Mr. Godinez replied, "I thought the situation was so outrageously dangerous that the only choice I had was to intervene."

Plaintiff relies on *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, calling it a "strikingly similar case." There is

14

nothing similar about it, except that two high school boys were "slap boxing." (*Id.* at pp. 746, 745.) The fight took place on school grounds during the noon recess and had continued for five to 10 minutes in front of a crowd of about 30 students gathered to watch. (*Id.* at p. 746.) One of the boys died after he was slapped, fell backwards and fractured his skull. (*Ibid.*) The court found the jury could reasonably conclude that the two employees responsible for supervising failed to exercise due care, and their negligence was the proximate cause of the tragedy. (*Id.* at p. 750.) "The fact that another student's misconduct was the immediate precipitating cause of the injury does not compel a conclusion that negligent supervision was not the proximate cause of Michael's death. Neither the mere involvement of a third party nor that party's wrongful conduct is sufficient in itself to absolve the defendants of liability, *once a negligent failure to provide adequate supervision is shown*." (*Ibid.*, italics added.)

The italicized premise for finding liability in *Dailey* is missing in this case. Plaintiff simply concludes, without citation to any evidence, that "[h]ere, there was a failure of supervision." The jury was entitled to conclude otherwise from the evidence we have already recounted.

Then plaintiff cites the CPI manual to the effect that risks are involved in any physical intervention and must be considered, and the manual "warns against acting with instinct." Plaintiff claims that "[s]ubstantial evidence proves . . . Godinez . . . failed to weigh the risks of his intervention," and did not consider "how his body could cause injury to [plaintiff]." Neither this nor any other of plaintiff's arguments about the evidence has shown that "there is no substantial evidence in support" of the verdict. (*Sweatman, supra,* 25 Cal.4th at p. 68; see *Flores v. Liu* (2021) 60 Cal.App.5th 278, 297 ["Where, as here, it is the *plaintiff*

15

asserting on appeal that a *defense* verdict is not supported by the evidence, it is the plaintiff's burden to show on appeal that there is *no* substantial evidence to support that defense verdict, and not merely that substantial evidence would have supported a verdict in her favor."].)

## 2. The Instructional Error Claim

Plaintiff contends he is entitled to a new trial because the trial court prejudicially erred when it refused to give six special instructions plaintiff requested. We disagree.

### a. Instructions given and instructions refused

The jury was instructed that, to establish his negligence claim, plaintiff had to prove Mr. Godinez or the District was negligent, plaintiff was harmed, and the negligence was a substantial factor in causing plaintiff's harm (CACI No. 400). Negligence was defined (CACI No. 401) as "the failure to use reasonable care to prevent harm to oneself or to others." The jury was instructed, as to each defendant, that "[a] person can be negligent by acting or by failing to act. [¶] A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. [¶] You must decide how a reasonably careful person would've acted in Defendant Marco Godinez's [or the District's] situation."

The jury was also instructed on the standard of care for minors (CACI No. 402); on the standard of care for a person with a physical disability (CACI No. 403); on the comparative fault of plaintiff (CACI No. 405); on the apportionment of responsibility to Christopher (CACI No. 406); and on the duty of care owed to children (CACI No. 412).

In addition, plaintiff requested several special instructions, six of which he contends should have been given. These were:

16

(1) that the special relationship between a student and teacher arising from mandatory school attendance "imposes an affirmative duty on the school district to take all reasonable steps to protect its students";

(2) that school authorities "have a duty to supervise at all times the conduct of children on school grounds and to enforce those rules and regulations necessary to their protection";

(3) the standard of care for school employees is "that degree of care which a person of ordinary prudence, charged with comparable duties, would exercise under the same circumstances" and that "[e]ither a total lack of supervision or ineffective supervision may constitute a lack of ordinary care";

(4) that school authorities "have a duty to train and supervise their employees' exercise of reasonable care in protecting students from foreseeable harm, including harm from other school employees";

 (5) the duty of care owed by school personnel "includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally"; and

(6) the very injury that occurred need not have been foreseeable; negligence is established "if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of such safeguards."

Plaintiff argued the instructions were "very pertinent to understanding" the special relationship that "creates an affirmative duty for the District that's not covered by CA[C]I." The court replied, "Do you think there is any case authority that says it's error not to give these instructions? Because I don't think they do anything. They may be accurate statements of the law, but I don't think they do anything. And so I'm not convinced

17

I should give them unless you can show me that there's case authority saying that it would be reversible error for me to refuse them."

Plaintiff's counsel could cite no such authority. The court stated that "[i]f you get it, let me know. Because that would change things. Or if in preparing the special verdict form you come up with an answer to a question in the special verdict form where it's going to require one or more of these instructions, let me know and I'll reconsider it."

### b. Legal principles

We review the propriety of jury instructions de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule, supra,* 8 Cal.4th at p. 580, quoting Cal. Const., art. VI, § 13.) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule,* at p. 580.) "Actual prejudice must be assessed in the context of the individual trial record. . . . Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

18

### c. Contentions and conclusions

Plaintiff contends the trial court erred when it failed to instruct the jury on the special relationship between school personnel and students. Plaintiff contends the "lack of instructions on [the District's] obligations to protect [plaintiff]" prejudicially affected the verdict.

We see no error in the trial court's conclusion that none of the requested instructions was necessary to assist the jury in deciding any of the fact questions they were asked to decide. The District's duty to protect plaintiff was never at issue; there was no dispute that both defendants were required "to use reasonable care to prevent harm to . . . others," which necessarily included plaintiff, and the jury was so instructed with CACI No. 401. Moreover, plaintiff's counsel read to the jury defendants' admission that Mr. Godinez "had a duty to supervise, control, and manage his classroom," and Mr. Godinez himself testified to that duty. The issue for the jury was whether Mr. Godinez breached that duty. The standard of care is precisely the same: the jury was instructed to "decide how a reasonably careful person would've acted in [Mr. Godinez's] situation." None of plaintiff's proposed instructions adds anything to that principle.

Plaintiff states he "advanced three theories at trial" that were supported by substantial evidence: that the District "failed to train" Mr. Godinez on safe intervention in student altercations, that Mr. Godinez "negligently failed to supervise his classroom," and that Mr. Godinez "negligently intervened in a student altercation in a manner that was contrary to the standard of care, causing severe injury." These three "theories of the case," however, are all ordinary negligence theories for which the standard of care is well established: ordinary care.

19

The standard of care is explained in *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869. " 'The standard of care imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care "which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances." ' " (*Ibid.*) In general, one has no duty to control the conduct of others or to protect another, unless a "special relationship" gives rise to such a duty. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619.) Because of the special relationship between school personnel and students under their supervision and control, the duty of care "includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*C.A.,* at p. 870.)

As we have seen, in this case the school's duty to prevent harm to plaintiff was never in dispute, so there was no need to instruct the jury on the "special relationship." The standard of care is the same: reasonableness under the circumstances. The only question for the jury was whether Mr. Godinez or the District did something "that a reasonably careful person would not do in the same situation or fail[ed] to do something that a reasonably careful person would do in the same situation."

Even if we were to find the trial court erred in refusing plaintiff's instructions (which we do not), plaintiff has not satisfied his burden to show a miscarriage of justice. As we have observed, when deciding whether an error of instructional omission was prejudicial, we evaluate the state of the evidence, the effect of other instructions, the effect of counsel's arguments,

and "any indications by the jury itself that it was misled." (*Soule, supra,* 8 Cal.4th at pp. 580-581.) None of these factors assists plaintiff.

There is no more to say than we have already said about the state of the evidence and the effect of the instructions that were given. As for the "effect o[f] counsel's arguments," plaintiff insists, at length, that the "lack of instructions on the school's affirmative duties" permitted defense counsel "to consistently skew the jury's *focus away* from the Defendants' obligations and instead onto [plaintiff's] and Christopher's negligence, improperly arguing that the conduct of the two students released Defendants from their responsibilities." For this assertion, plaintiff cites six transcript pages of defense counsel's opening argument, and five pages of counsel's closing argument. Plaintiff identifies nothing specific in the opening argument to justify his characterization of it as "improper." It was not.

The defense opening argument included a slow-motion review of the video and argument that Mr. Godinez was doing the right thing for the right reasons, while plaintiff and Christopher were not acting like reasonably careful teenagers of the same age, intelligence, experience and knowledge. As for the defense's closing, plaintiff mischaracterizes the argument that plaintiff should be held accountable as an "assumption of risk" argument in contravention of the court's ruling that assumption of the risk doctrine did not apply, and says it was "misconduct to mislead a jury by a false statement of law." There was no misconduct. The defense was entitled to argue that plaintiff was in the wrong for fistfighting in class and for continuing to punch after Mr. Godinez stepped in, and that Mr. Godinez acted as a reasonable and careful teacher would have acted in that situation. The defense

at no time engaged in "misconduct" and at no time "[s]uggest[ed] that the jurors *disregard* the law."

Finally, plaintiff claims the jury's answers on the special verdict form show it was misled by the lack of instructions on defendants' special duty. We have described the jury's answers at pages 12 through 13, *ante*. In summary, although the directions on the verdict form told the jury not to answer question No. 8, apportioning fault, if it found neither defendant was negligent, the jury answered that question anyway, apportioning zero fault to defendants and 50 percent fault on the part of each of the two boys. We see no jury "confusion" whatsoever on the matters the jury was charged with deciding; the error in answering a question they were not asked simply shows the jury's emphatic rejection of defendants' liability.

In short, even if there had been any error in the court's instruction, plaintiff has failed to show any prejudice.

3.     **Exclusion of Expert Testimony**

The court excluded the testimony of Mr. Dickerson, plaintiff's sole expert on the standard of care. We have described Mr. Dickerson's qualifications and the trial court's reasoning at pages 9 through 11, *ante*. In brief, the trial court concluded, after voir dire of Mr. Dickerson, that it had heard nothing "that shows what his expertise is with respect to managing a classroom and dealing with an unruly student in a classroom," and held that Mr. Dickerson was "not qualified in the area of expertise that's relevant." (Later, testimony from the defense's expert was also excluded.)

We review a trial court's decision to admit or not admit evidence, including expert evidence, for abuse of discretion. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) Any error in excluding evidence is

grounds for reversal only if the party appealing demonstrates a miscarriage of justice. (*Ibid.*) We see no abuse of discretion on this record.

Plaintiff argues to the contrary at length. Plaintiff asserts the trial court "held an erroneous view of the issues," and Mr. Dickerson was "qualified and experienced" on safe physical interventions. Plaintiff acknowledges "that Dickerson did not have direct experience teaching, or managing a classroom," but contends this "was not dispositive of his qualification to opine on [the District's] training and Godinez's intervention." He criticizes the trial court's "overly strict standard requiring a personal working knowledge of classroom management and discipline." He acknowledges the court also excluded the defense expert's testimony, but complains "that still left the Defendants with the advantage of testimony from various school district staff about training and school policy." He says that "[w]ithout Dickerson's expert opinions, [District] employees presented testimony that distorted the issues," and recites and criticizes employee testimony. He laments that plaintiff "could not have his expert explain whether a safety plan that addressed bomb threats, armed assaults, hostage situations etc., but did not address student fights, was a failure on the part of [the District]."

We can see no error in "requiring a personal working knowledge of classroom management and discipline" from an expert purporting "to explain to the jury *why and how* Godinez's intervention" – in a classroom student altercation – was "unreasonable." Further, we agree with the trial court that the jury watched the video and did not need an expert to expound upon "whether or not the . . . intervention was just and how the intervention happened, [and] whether or not it was conducted

23

safely." There was no error in excluding Mr. Dickerson's testimony.

## DISPOSITION

The judgment and the order denying plaintiff's motion for judgment notwithstanding the verdict and alternatively for a new trial are affirmed. Defendants shall recover their costs on appeal.


GRIMES, J.


WE CONCUR:



STRATTON, P. J.



VIRAMONTES, J.

Filed 2/6/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| I.C., | B322148 |
|---|---|
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC665118 |
| v. | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| COMPTON UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | **[No Change in Judgment]** |

THE COURT:

The opinion in the above-entitled matter filed on
January 15, 2025, was not certified for publication in the
Official Reports. For good cause, it now appears that the
opinion should be published in the Official Reports and it is
so ordered.

There is no change in the judgment.

_____

STRATTON, P. J.        GRIMES, J.        VIRAMONTES, J.